[Nos. 2063–3; 2152–3. Division Three. April 13, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. DANIEL MAURICE DAULT, ET AL, *Appellants.*

*Sensney, Davis & McCormick, William A. McCormick,* and *Michael R. Pickett,* for appellants (appointed counsel for appeal).

*Curtis Ludwig, Prosecuting Attorney,* for respondent.

MUNSON, C.J.—John Howard Wilder was convicted of murder in the first degree under Laws of 1909, ch. 249, § 140, p. 930,[1] previously RCW 9.48.030; Daniel Maurice Dault was convicted of murder in the second degree under Laws of 1909, ch. 249, § 141, p. 930,[2] previously RCW 9.48-.040; John Lee Richards was acquitted of murder in the first degree. Although Dault and Wilder filed separate notices of appeal and submitted separate briefs, we consolidate these appeals. For the reasons set out below, we reverse both convictions and remand for a new trial.

---

[1] "The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either—
 "1. With a premeditated design to effect the death of the person killed, or of another; or"

[2] "The killing of a human being, unless it is excusable or justifiable, is murder in the second degree when—
 "1. Committed with a design to effect the death of the person killed or of another, but without premeditation; or

On or about September 19, 1974, Larry Cannon was killed by a blow to the head at a duplex apartment shared by John Ramirez, his brother and Dault. After the killing, Dault, Wilder, Ramirez and Richards transported the victim's body to a ravine in Franklin County where it was found in 1976.

The circumstances of the killing are in dispute. Ramirez, who was given immunity in exchange for his testimony, testified: Several days prior to the killing Ramirez, Dault, Richards and Wilder had planned to kill the victim at the duplex because Wilder thought the victim had stolen a large quantity of Wilder's drugs. Earlier, on the afternoon of his death, Larry Cannon had been involved in an accident with a motorcycle in front of the duplex. This accident was investigated by the state patrol. After Cannon's accident, Dault, Richards and Ramirez became nervous about following up on the planned killing that afternoon and had abandoned that plan. Wilder became very upset, however, when he heard of the others' intention to abandon the act and gave every indication of going ahead with it. Later that afternoon, Ramirez, Wilder, Dault and Cannon were in the kitchen of the duplex, at which time Dault hit Cannon on the back of the head with a metal bar used to support weights, *i.e.*, a barbell bar. At that time, Richards was in the living room. Thereafter, Wilder injected a sufficient amount of heroin into Cannon's body to constitute an overdose, and they transported the body to the ravine in Franklin County.

In contrast, the defendants Dault and Wilder contend that there never was a plan to kill Cannon, but rather Cannon had come to the duplex to sell heroin to Dault. While the two were in the kitchen negotiating the sale, Cannon got jumpy, pulled a gun, and demanded money from Dault

"2. When perpetrated by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a felony other than those enumerated in section 140 of this act.

"Murder in the second degree shall be punished by imprisonment in the state penitentiary for not less than ten years."

before he would deliver the heroin. Wilder came into the kitchen, and asked Cannon what was going on. When Cannon turned to face Wilder, his back being to Dault, Dault then hit him in the back of the head so that Cannon would not shoot him. Ramirez was not in the house at that time, but arrived shortly thereafter. The four men became nervous, upset and concerned about the disposal of the body. Thus they agreed to transport the body to the ravine in Franklin County.

Both defendants raised similar issues, and we shall discuss them seriatim.

A. *Improper burden of proof.*

 Subsequent to trial, *State v. Roberts,* 88 Wn.2d 337, 562 P.2d 1259 (1977); *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976); and *State v. Modica,* 18 Wn. App. 467, 569 P.2d 1161 (1977), were decided. Thus, by supplemental brief, Dault contends the trial court erred in giving instructions Nos. 9 and 23.[3] Although matters on appeal cannot be raised for the first time in a supplemental brief or unless they have been previously raised at the trial level, *cf. State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976), it will be so considered when there is an alleged violation of a specific constitutional right. *State v. Modica, supra.*

 The instruction rejected in *State v. Kroll, supra* at 839, is indistinguishable in its tenor from instruction No. 9 given in the instant case. As the court stated in *State v.*

---

[3]Instruction No. 9:

"When the killing of a human being by another is proven beyond a reasonable doubt, the law presumes that such killing constitutes murder in the second degree. The burden is upon the state to raise the charge to murder in the first degree by proof beyond a reasonable doubt. The defendant bears the burden of justifying his act or of reducing the charge to manslaughter."

Instruction No. 23:

"When a defendant claims that he killed another in the defense of his own person, the burden is upon the defendant to prove that the homicide was done in self-defense. It is not necessary for a defendant to prove this to you beyond a reasonable doubt, nor by a preponderance of the evidence. A defendant sustains this burden of proof if from a consideration of all the evidence in the case you have a reasonable doubt as to his guilt."

*Kroll, supra* at 840, "Such a shifting of the burdens of proof clearly violates the concept of due process announced for the first time in *Mullaney v. Wilbur* [421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975)]". Thus, the giving of this instruction was reversible error as to the defendant Dault. *State v. Stepp,* 18 Wn. App. 304, 308–09, 569 P.2d 1169 (1977). However, since defendant Wilder was convicted of first–degree murder, the giving of instruction No. 9 was harmless error as to him. *State v. Kroll, supra* at 840.

■ Instruction No. 23 relates to self–defense and is violative of the court's condemnation not only of the instruction relating to the presumption of second–degree murder, but the self–defense instruction given in *State v. Roberts, supra.* With minor deviations, the instruction given in the instant case is the same as that given in *Roberts;* the giving of that instruction constitutes prejudicial and reversible error as to the defendant Dault. *State v. Stepp, supra.* Again, that instruction is not applicable to defendant Wilder; he did not assert self–defense.

■ Dault also contends the court erred in giving instruction No. 20, which states:

Every killing of a human being is presumed in law to be without excuse or justification. Any matter of excuse or justification that may exist for such killing, if such killing you find to be a fact, is a matter of defense and the state is not required to prove to you affirmatively that no such excuse or justification existed. It is required, however, that you be convinced, from all the facts and circumstances surrounding the transaction, beyond a reasonable doubt, that such killing was without excuse or justification, as the same have been defined to you in these instructions.

Both the first– and second–degree murder statutes in effect when this killing occurred contained the following language, "the killing of a human being, unless it is excusable or justifiable," is either first– or second–degree murder,

depending upon the balance of the respective statutes.[4] The inclusion within the statutes of the language "unless it is excusable or justifiable" indicates that the lack of excuse or justification is an element of both first– and second–degree murder. *See State v. Roberts, supra* at 345.

Instruction No. 20 allows one of the elements of murder (absence of excuse or justification of the homicide) to be presumed and states that, "the state is not required to prove to you affirmatively that no such excuse or justification existed." Thus, the instruction shifts the burden of proof for this element from the state to defendant. This is an improper shifting of the burden of proof and requires reversal. *Mullaney v. Wilbur,* 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975); *State v. Roberts, supra; State v. Kroll, supra; cf. State v. McDonald,* 89 Wn.2d 256, 571 P.2d 930 (1977). As noted in *Patterson v. New York,* 432 U.S. 197, 215, 53 L. Ed. 2d 281, 97 S. Ct. 2319, 2330 (1977):

> *Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense. . . . Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.

Therefore, we conclude that the giving of instruction No. 20 constituted an impermissible shifting of the burden of proof to the defendants, a denial of due process, and reversible error as to both defendants.

Since this case must be reversed and remanded for a new trial for both defendants, we will discuss the remaining assignments of error only to the extent that they may arise on retrial.

---

[4]First–degree murder: Laws of 1909, ch. 249, § 140, p. 930, previously RCW 9.48.030; second–degree murder: Laws of 1909, ch. 249, § 141, p. 930, previously RCW 9.48.040.

B. *State's use of defense counsel's statements at omnibus hearing to impeach the defendant's testimony at trial.*

CrR 4.5(h) requires that a summary memorandum be prepared at the conclusion of the omnibus hearing and sets forth the form which the memorandum should substantially follow. The form includes a motion by the defendant for certain pretrial procedural matters, as well as requiring the prosecution to provide certain identified information. It next provides a motion whereby the plaintiff may make application for certain information to be supplied by the defendant, including, "Defendant to state the general nature of his defense." The prosecutor made the above motion. At the omnibus hearing held May 25, 1976, Dault's attorney stated:

As for my defendant, the general nature of the defense is that he was not a party to the homicide, if that occurred. That is to say, whether or not there was a homicide he does not know, but if in fact there was a homicide that he had no participation in the killing whatsoever.

Unfortunately, he was involved in what was a dumb thing that happened afterwards, which would make him an accessory, perhaps, the removal of the body, and he believes that the slayer was, of course, the State's principal witness, John Ramirez.

That is the nature of our defense.

Thereafter, Wilder's attorney stated:

Your Honor, I am going down the State's omnibus application. "Defendant to state the general nature of his defense." In relation to John Wilder, the defense of John Wilder is apparently substantially similar to that of Mr. Dault, and that is the fact that he had nothing to do with this homicide of which he finds himself charged here.

He came upon the scene and it was made known to him in a short time, apparently, after it had taken place, if a homicide had taken place, and he helped to dispose of the body with various other people, and that was about the size of it.

At trial both defendants took the stand and testified they were both present at the apartment at the time of the killing. On cross–examination, the prosecution was permitted, over objection, to inquire whether, in fact, they were present at the omnibus hearing and, in fact, whether their attorneys had represented to the court that the nature of their defense was that they were not upon the premises at the time of the killing. Defendants now contend that cross–examination was prejudicial error and that they are not bound by the attorney's statements at the omnibus hearing because such statements are not the type of admissions with which they could be impeached. Clearly, the defendants themselves did not make the admissions at the omnibus hearing.

As we noted in *In re Adoption of Coggins,* 13 Wn. App. 736, 739, 537 P.2d 287 (1975):

An attorney is impliedly authorized to stipulate to, and waive, procedural matters in order to facilitate a hearing or trial; but, in his capacity as an attorney, he is without authority to waive any substantial right of his client unless specifically authorized to do so.

*Accord, Morgan v. Burks,* 17 Wn. App. 193, 563 P.2d 1260 (1977); *Grossman v. Will,* 10 Wn. App. 141, 149, 516 P.2d 1063 (1973).

Wigmore distinguishes between quasi–admissions and solemn or judicial admissions. 4 J. Wigmore, *Evidence* §§ 1058, 1059, at 26, 27 (1972). In discussing the difference, the text states:

§ 1058. . . . The law of evidence has suffered, in its most vital parts, from an ailment almost incurable—that of confusion of nomenclature. The term "admissions" exhibits this misfortune in one of its notable aspects. There are two principles, not at all connected, which for a century or more have had to be discussed by the aid of a single and common term. One of these principles . . . authorizes the receipt of any statement made by an opponent, as evidence in contradiction and impeachment of his present claim. Such statements, here referred to in the loose and usual phraseology as "admissions," should

better, with a view to discrimination and clearness, be designated quasi admissions.

The true admission, in the fullest sense of the term, is another thing, and involves a totally distinct principle. It concerns a method of escaping from the necessity of offering any evidence at all. The former is an item in the mass of evidence; the latter is a *waiver relieving the opposing party from the need of any evidence.*

§ 1059. . . . (1) A quasi admission, of the present sort, being nothing but an item of evidence, is therefore *not in any sense final or conclusive.* The opponent, whose utterance it is, may none the less proceed with his proof in denial of its correctness; it is merely an inconsistency which discredits, in a greater or less degree, his present claim and his other evidence.

The court in *State v. Nelson,* 14 Wn. App. 658, 545 P.2d 36 (1975), considered the question of whether requirements of CrR 4.5 and 4.7 were violative of the defendant's Fifth Amendment rights. Adopting the rationale of *Wardius v. Oregon,* 412 U.S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208 (1973), and *Williams v. Florida,* 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893 (1970), the court stated that the rules merely allowed for an accelerated disclosure of information which must ultimately be revealed, and that their purpose was to prevent last–minute surprise, trial disruption, and continuances and to encourage the early disposition of the cases through settlement.

The attorneys' function at an omnibus hearing is to represent and speak for the defendants. These statements would not constitute formal, solemn or judicial admissions dispensing with the state's need to prove the crime committed (*cf. Hogenson v. Service Armament Co.,* 77 Wn.2d 209, 214, 461 P.2d 311 (1969)), nor did the statements waive any of defendants' substantive rights. Merely stating the general nature of the defense was within the scope of the attorneys' employment and within the sphere of their management of the litigation. 4 J. Wigmore, *Evidence* § 1063 (1972); *cf. Dastagir v. Dastagir,* 109 Cal. App. 2d 809, 241 P.2d 656 (1952). As such, they constitute quasi–admissions and are admissible to discredit and impeach the

718

defendants' testimony. *Cf. State v. Harris,* 14 Wn. App. 414, 422, 542 P.2d 122 (1975):[5] Thus, it is apparent that the admission by the attorney as to the general nature of the defense related to his management of the litigation and was not violative of a substantive right. Also of considerable importance is the fact that the attorneys' revelations were made in the presence of their clients. Both defendants were present in court at the omnibus hearing. Although the form suggested by CrR 4.5(h) may not be such as would cause the defendants to speak out, they could have consulted with their counsel if in fact the defense was otherwise.

The statements were used to indicate that the defendants had made prior inconsistent statements as to their respective involvement and knowledge of the killing. Evidence of these prior inconsistent statements was admissible.

### C. *Denial of cross-examination regarding the use of the drug methadone.*

Kathy Willis was called as a witness for the State and testified that she and her husband had been keeping heroin valued at $1,000 to $1,300 for the defendant Wilder. She further testified that she had called Wilder about a week before the victim's disappearance and concocted the story that a tall, thin person had taken the heroin from her at gunpoint. Wilder had come to her home, interrogated her regarding the robbery, and upon leaving, stated that he was going to look for Larry Cannon. She further admitted that she had made up the story about the robbery, that it was not true, and that it had been calculated to cover her own loss. On cross-examination she was asked: "Q Are you using methadone now?" The State objected. The objection was sustained and subsequently defendant Dault made the following offer of proof:

---

[5]We recognize that in *Harris* the statement was made by the defendant. Preferably, with the defendants present, the instant issue could have been negated by asking the defendants themselves the nature of their respective defenses.

[D]efendant Danny Dault would offer this proof with Kathy Willis if she would have been allowed to answer and testify: When I asked her if she was on methadone she would respond that she is now on methadone, that methadone is used as a substitute for heroin, and that she has been hospitalized is my understanding. She has been hospitalized for this treatment of methadone. It has a physiological and psychological effect on a person who is using it. And that it is a substitute for heroin and induces kind of a high or tranquilizing effect. That is all.

Generally, evidence of drug use is admissible to impeach the credibility of a witness if (1) there is a showing that the witness is using or is influenced by drugs at the time of testifying, (2) if there is a showing that the witness was using or was influenced by the drugs at the time of the occurrence which is the subject of the testimony, or (3) when a defendant puts his own character in issue. *State v. Renneberg*, 83 Wn.2d 735, 738, 522 P.2d 835 (1974). Annot., *Use of Drugs as Affecting Competency or Credibility of Witness*, 65 A.L.R.3d 705, §§ 5(a), 6 (1975); 50 Wash. L. Rev. 106 (1975). Absent a showing of such events, however, evidence of drug use by a witness is inadmissible to show a general lack of veracity in the absence of medical or scientific proof associating that drug use with a general lack of veracity. *State v. Renneberg, supra.*

Here, there is no scientific or medical evidence associating the drug methadone with a general lack of veracity or indicating that the same creates a physiological or psychological effect; nor is there any indication that the witness did not understand the nature of the oath or was incapable of giving a correct account of what she had done and the ensuing conversations. The defendant Dault did not challenge her testimony on the basis of RCW 5.60.050, which is a statutory disqualification as to competency when the person is intoxicated at the time of her production for examination. We take judicial notice that methadone is used as a substitute for heroin; but without expert testimony as to its effects, we are unwilling to recognize that the testimony of a person using methadone at the time of testifying is

affected by that use of methadone, much less that that person is incompetent to testify. Therefore, there is a lack of evidence supporting the offer of proof. The trial court was correct. The defendant Wilder joined in the objection and in the offer of proof; his assignment of error must fail for the same reason.

D. *Inconsistent jury verdicts.*

Defendant Wilder contends that the court erred in upholding inconsistent jury verdicts inasmuch as he had been convicted of murder in the first degree as an aider and abettor, whereas the person who struck the blow, defendant Dault, was convicted of second–degree murder. In that a retrial will be necessary, we do not reach the merits of this issue. However, *see* Annot., *Acquittal of Principal or Conviction of Lower Degree of Offense as Affecting Prosecution of Aider and Abettor,* 24 A.L.R. 603 (1923); *see also* Annot., *Inconsistency of Criminal Verdicts as Between Two or More Defendants Tried Together,* 22 A.L.R.3d 717, § 13 (1968).

E. *Right to compulsory attendance of witness.*

The defendant's complaint on this issue should not recur on retrial. Both defendants have the right to compulsory attendance of witnesses. On appeal, defendant Wilder contends that the prosecution through the Benton County Sheriff's Department tampered with the defense witness and thus violated Wilder's constitutional right to compulsory attendance of that witness. John Ramirez was the chief witness for the prosecution. Defendants anticipated calling Mrs. Ramirez to impeach his testimony by pointing out inconsistencies between his testimony at the time of the trial and conversations he initially had with his wife concerning killing. During trial, defendants[6] moved for a mis-

---

[6]Although the attorney for defendant Dault actually made the motion, defendant Wilder's attorney apparently concurred and participated in presenting it to the court.

trial because of the alleged tampering by Deputy Sheriff Smith. Subsequent to that motion, the court ordered that both Mrs. Ramirez and Deputy Sheriff Smith give statements under oath to allow the court to determine whether there had been any tampering.

The testimony of Mrs. Ramirez and the deputy sheriff reflected the following: The evening before Ramirez was to testify at trial, Deputy Sheriff Smith had called Ramirez' employer in an effort to contact Ramirez to see if he needed a ride to court the next day. The employer's wife stated that Ramirez and his wife, who lived in a trailer near the place of employment, were fighting and that the deputy sheriff should come out and talk to Ramirez personally. After the deputy sheriff arrived, it was apparent that the Ramirezes had been fighting. Mrs. Ramirez then left the trailer and started walking up a country road. Deputy Sheriff Smith followed her in his patrol car, and he was later joined by another deputy sheriff. Eventually, the deputy sheriffs physically placed Mrs. Ramirez into the second deputy's car. That deputy later let her out of the car and allowed her to proceed on her way. Deputy Sheriff Smith stated that Mrs. Ramirez had threatened to commit suicide that evening, but she denied she made such a statement. She did admit that she had stated that she would not testify at the trial. She also stated during the hearing that both her husband and the prosecuting attorney had been badgering her as to her prospective testimony.

Subsequent to the hearing, the court denied defendant's motion, finding that no tampering had taken place. Mrs. Ramirez was never called, other than to testify at this hearing. She gave no testimony relating any conversations with her husband, because neither defendant called her as a witness. The defendants have failed to assert and maintain their right to the compulsory process to compel her testimony, a right they now claim. They were not denied the right to compulsory process. *State v. Summers,* 60 Wn.2d

702, 375 P.2d 143 (1962). Moreover, any influence allegedly exerted upon Mrs. Ramirez by the State was not prejudicial; *State v. Young,* 11 Wn. App. 398, 523 P.2d 946 (1974); nor is the contact between the deputy sheriffs and Mrs. Ramirez analogous to the influence exerted in *State v. Kearney,* 11 Wn. App. 394, 523 P.2d 443 (1974). Therein the court ruled that an implantation of bias, suspicion or prejudice against the defendant was unconstitutional. The trial court did not find those conditions here. We find no error.

Thus, having concluded that the convictions of both Dault and Wilder must be reversed, these matters are remanded for retrial.

GREEN and McINTURFF, JJ., concur.

Reconsideration denied May 12, 1978.