[No. 40945-3-II.   Division Two.   August 8, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. RAYMOND WESLEY GARLAND, *Appellant*.

870

*Sheri Lynn Arnold*, for appellant.

*Mark E. Lindquist, Prosecuting Attorney*, and *Stephen D. Trinen, Deputy*, for respondent.

¶1 VAN DEREN, J. — Raymond Garland appeals his convictions for second degree murder, second degree manslaughter, and second degree assault, all with firearm enhancements, for his participation in a deadly altercation at Bleacher's Sports Bar and Pub in the early hours of November 12, 2004.[1] In the published portion of this decision, we discuss Garland's argument that the trial court erred in allowing the State to impeach him with his counsel's opening statements from two prior proceedings that ended in mistrials. In the unpublished portion, we address his assertion that the trial court violated the appearance of fairness doctrine when it ruled that it would not address his CrR 8.3(b) dismissal motion until after the conclusion of his jury trial. Finding no abuse of discretion or error, we affirm.

## FACTS

¶2 On November 11, 2004, Garland celebrated his 21st birthday with family at a Black Angus Steakhouse restaurant.[2] Garland later met friends at Krickets Restaurant and Lounge in Tacoma and, even later, met more people at Bleacher's, another local bar. Shortly after midnight, Garland and a friend, Michael Behe, were talking in the

---

[1] The trial court also found Garland guilty of first degree unlawful possession of a firearm after Garland waived his right to a jury trial on that count.

[2] Because numerous trial judges and court reporters were involved in this trial, we refer to the volume number of the Report of Proceedings in the third trial alone (volumes 1 through 32) and all other proceedings solely by date.

Bleacher's parking lot when several cars pulled in, one of which lightly struck a telephone pole while parking. After Garland made a comment to the driver about striking the pole, an argument ensued.

¶3 The driver of the car that struck the pole, Earl "Keyon" Brock, was with his girl friend, Shelley Dominick, his cousin, Karltin Marcy, Dominick's sister, Lisa Loggins, and another couple, Tim Valentine and Lisa Lambert. Most of them had been drinking, at least moderately, at an earlier party.

¶4 Dominick, Marcy, Loggins, Valentine, and Lambert all related that Brock got into an argument with Garland and, shortly thereafter, Brock was fatally shot in the chest and Marcy sustained a bullet wound to the groin. More specifically, Valentine (the most sober person by all accounts) recalled that the shooter had a neck tattoo and that he actually saw the shooter pull a gun from his hip area. Lambert also related that the shooter had a neck tattoo. Nobody but Garland contended that either Marcy or Brock had a gun.[3] Although he denied it at trial, Behe told officers in a taped interview sometime after the incident that Garland was carrying a gun at the time of the shooting.

¶5 After contacting police, both Valentine and Lambert later identified Garland—who has a neck tattoo that reads "Prince Charming"—from a photomontage. 9 Report of Proceedings (RP) at 1215. The lead detective assigned to the case, Pierce County Sheriff's Detective Deborah Heishman, concluded that Garland was a suspect because Valentine and Lambert had both told her that the shooter's first name was "Ray," that he was celebrating his 21st birthday, an anonymous tip corroborated Lambert and Valentine's stories, and another detective identified a Raymond Garland as a possible suspect because Garland turned 21 on November 11, 2004, and matched the descriptions provided by witnesses

---

[3] Ballistics later confirmed that all the bullets and casings found at the scene came from the same firearm.

and the anonymous tip. Marcy also identified Garland as the shooter when later presented with a photomontage.

¶6 Police arrested Garland on November 17, 2004, and the State charged Garland with first degree murder, first degree assault, first degree unlawful possession of a firearm, and second degree assault on November 18. RCW 9A.32.030(1)(b); RCW 9A.36.011(1)(a); former RCW 9.41-.040(1)(a) (2003); RCW 9A.36.021(1)(c). The State also alleged that Garland committed each of these crimes with a deadly weapon (a firearm), contrary to RCW 9.94A.510. After twice amending the information, the State eventually brought four charges to trial: count I, premeditated murder, contrary to RCW 9A.32.030(1)(a) or, in the alternative, murder as the result of extreme indifference to human life, contrary to RCW 9A.32.030(1)(b); count II, second degree murder, contrary to RCW 9A.32.050(1)(b); count III, first degree assault (for the injury to Marcy), contrary to RCW 9A.36.011(1)(a); and count IV, first degree unlawful possession of a firearm, contrary to former RCW 9.41.040(1)(a). The State alleged that Garland committed counts I, II, and III while armed with a deadly weapon, a firearm, contrary to RCW 9.94A.510.

¶7 At the first pretrial hearing on March 25, 2005, the trial court addressed a motion from the State "regarding possible disqualification" of the assigned trial judge.[4] Report of Proceedings (RP) (Mar. 25, 2005) at 4. After an off-the-record discussion between Garland's attorney[5] and the prosecutor, Garland's attorney indicated that he would prefer that the assigned trial judge hear the case, explaining,

---

[4] Although this motion does not appear in the court record, later motions reveal that at this early stage of the trial, there was some indication that either Garland's family or his associates had threatened the assigned trial judge or that the lead detective had conveyed to other law enforcement officers that such threats had been made.

[5] Garland eventually replaced his first attorney, who represented him in the earliest proceedings. His new attorney represented Garland at all three trials— including the third trial through the jury verdict—and withdrew at sentencing.

This court and I have had a long-standing relationship, and that relationship has been favorable. My discussions with my client and his family regarding this court handling this case was very positive and very favorable. . . . We are happy to be here. We are desirous that this court hear this matter. I have explained to Mr. Garland and his family several weeks ago when we were assigned here that I viewed this court as a very favorable trial court, and that is the position of all of the parties at this point.

RP (Mar. 25, 2005) at 5-6.

¶8 On January 16, 2007, Garland waived his right to a jury trial on the unlawful possession of a firearm charge. Garland's first trial began on January 24. The trial court declared a mistrial on March 23, after the jury had been reduced to 11 members for various reasons.

¶9 Garland's second trial began on August 21, 2007, and, again, Garland waived his right to a jury trial on the first degree unlawful possession of a firearm charge. On September 24, Garland asked the assigned trial judge to recuse in light of newly discovered information about the alleged threats to the trial judge from Garland's family and associates. The trial court declared a second mistrial and immediately recused.

¶10 Garland's third trial began on August 10, 2009. Garland again waived having his unlawful firearm possession charge heard by the jury. On October 26, the jury found Garland guilty of second degree manslaughter, second degree murder, and second degree assault. The jury also found that Garland committed all three of these crimes while armed with a firearm. On May 3, 2010, the trial court found Garland guilty of first degree unlawful possession of a firearm. Garland timely appeals.

## ANALYSIS

¶11 Garland first argues that the trial court erred in allowing the State to impeach him with his trial counsel's

opening statements from the two previous proceedings that ended in mistrials. The State counters that "a statement by an attorney may be attributable to a criminal defendant" for purposes of impeachment "where the defendant was present when the attorney's statement was made and [the defendant] did not attempt to correct or dispute that statement" or, in the alternative, that the statements were "separately admissible as a statement against penal interest by a party opponent under ER 801(d)(2)(i)." Br. of Resp't at 11, 16.

¶12 Because this is an issue of first impression in Washington, little precedential authority is available to assist us in making our decision. Nevertheless, the Second Circuit of the United States Court of Appeals has addressed whether defense counsel's prior opening statements can be used to impeach a defendant following a mistrial. We look to the well-articulated reasoning in that decision, *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), and adopt a similar rule: a trial court does not abuse its discretion in allowing the State to impeach a criminal defendant when it has determined, outside the jury's presence, that "the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial" and the inconsistency is equivalent to a testimonial statement by the defendant that is "clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial." *McKeon*, 738 F.2d at 33.

I. Standard of Review

¶13 We review a trial court's admission of evidence for abuse of discretion. *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). We will find an abuse of discretion "when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). A decision is based "on untenable grounds" or made "for untenable reasons" if it rests on facts unsup-

ported in the record or was reached by applying the wrong legal standard. *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995). A decision is "manifestly unreasonable" if the trial court, despite applying the correct legal standard to the supported facts, adopts a view "that no reasonable person would take," *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990), and arrives at a decision "outside the range of acceptable choices." *Rundquist*, 79 Wn. App. at 793. We review the interpretation of evidentiary rules de novo. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

## II. IMPEACHMENT WITH COUNSEL'S OPENING STATEMENTS

### A. Counsel's Statements in the First Two Trials

¶14 In opening statements during the first trial in January 2007, Garland's counsel told the jury, "Unfortunately, [Garland] had a gun. He had a gun. He should not have had a gun, but merely having a gun does not make [Garland] guilty of murder." 6 Clerk's Papers (CP) at 1090. Counsel also argued that Brock

> started to take off his coat. And that, of course, is a manifestation of his intent to engage in a physical fight. As he did that, he pulled out a revolver, a revolver. And he pulled out the revolver, and he pointed it at [Garland].
>
> . . . .
>
> [Garland] was confident that the gun that was pointed at him by Earl Brock would discharge and would kill him. So he took the gun that he had, and he shot him.

6 CP at 1097-99. The trial ended in a mistrial before the defense could present its case after the jury had been reduced to 11 jurors.

¶15 When the second trial began in August 2007, Garland's attorney again told the jury in opening statements that both Garland and Brock were carrying guns on the night of the incident:

> Now, it's true that [Garland] had a gun with him at that time. He didn't have a 9 millimeter, but he had a gun. Maybe he

shouldn't have had the gun, but he had a gun and he needed to use the gun. He needed to use the gun to act in self-defense.

. . . .

. . . When he saw Mr. Brock reach in and pull out a revolver, you can imagine what he thought. You can imagine, a young man out on his birthday facing the barrel of a gun. He defended himself the only way he could.

6 CP at 1117, 1125-26. Before the State rested its case, the assigned trial judge declared a second mistrial and recused.

B. Counsel's Opening Statement and Garland's Testimony in Third Trial

¶16 During the third trial in August 2009, the defense reserved its opening. In preliminary discussion outside of the jury's presence, the trial court asked whether, in light of Garland's failure to submit proposed jury instructions before trial, "are there going to be any theories that have not been advanced such that the State has to be considering them?" 2 RP at 133. Garland responded that he continued to endorse "general denial and/or a self-defense." 2 RP at 134. When further pressed as to whether any *new* theories would be advanced that the State should be aware of prior to delivering its opening statement (without the benefit of the defense's proposed jury instructions), Garland again said, "No."[6] 2 RP at 134.

¶17 After the State rested, Garland's attorney began her opening statement by stating,

Good morning, ladies and gentlemen. November 11th, 2004, was, in fact, [Garland's] birthday. [Garland] was 21 that day. It was to be a day of celebration. The day of celebration turned into a horror, a nightmare. [Garland] was terrorized by Mr. Brock and Mr. Marcy, who pulled a gun on him in the parking lot of Bleacher's. There was a struggle for the gun. The gun

---

[6] The State also submitted a motion for sanctions in January 2009 for the defense's failure to, inter alia, state the general nature of the defense and whether the defendant would rely on alibi as mandated by CrR 4.7(b)(2)(xii) and (xiv).

went off. [Garland] was grabbing the hand of Mr. Brock and Mr. Marcy, trying to keep himself from being shot.

6 CP at 1166. She further stated,

Karltin Marcy, who was behind Earl Brock, gave [Brock] a firearm. [Garland] doesn't know much about the firearm, except that it was black and it was just a little bigger than his hand. At that time, [Garland] was terrified. He was absolutely terrified. He knew that, in this really confined area between the two cars, with a man with a gun pointing at him, that he really couldn't run. . . .

Being 21 and perhaps not acting according to the adage that discretion can be the better part of valor, he made a decision to try to struggle for the gun, and so he lunged at Earl Brock -- Karltin was there -- and they had a physical fight over the firearm.

During this physical fight, [Garland] was trying to grab Mr. Brock's arm, basically, to keep him from doing anything with the firearm. . . .

During this altercation, [Garland] heard a shot. [Garland] will not be able to tell you how many shots he heard, because he was so close to the firearm in this confined space, and the shot that he heard was absolutely deafening. . . . He was so close. He saw a flash, and he heard a shot, and it was right in his ears, and there may have been other shots. [Garland] doesn't know. He just doesn't know, but he knows that there was at least one shot.

. . . .

[Garland] didn't know that anybody had been shot.

6 CP at 1172-74.

¶18 Following this surprise change in the defense's theory of the case and, perhaps most importantly, the defense's significantly altered statement of the material facts, the State attempted a number of times to argue about prejudicial discovery violations outside the jury's presence. During one such argument, the trial court commented,

I think the defense needed to be more up front, even from the get-go, with regard to providing the nature of their defense. I'm

not sure that the defense, in this case, has ever truly articulated to the State, before trial, what the nature of their defense was, except in the most general of terms, and I think the Court rules anticipate something more than just kind of across the board you prove it kind of response to the request for discovery, and to state the nature of the defense. And even self-defense may not be sufficient enough if there are specifics of the nature of the self-defense or if it's a case of accident or both self-defense and accident, as to what the dynamics were.

24 RP at 3123. The State refrained from advancing its concerns over the defense change of strategy in any proceedings before the jury.

¶19 Toward the end of trial, the defense called Garland as its last witness. Garland testified consistent with the version of facts—the "struggle for the gun" version—presented by his counsel in the defense's opening statement in the third trial, stating that he saw Marcy hand a gun to Brock, the two fought over the gun, at least one shot went off, and he fled without knowing that anyone had been injured. On cross-examination, the following exchange occurred between Garland and the prosecutor:

Q   And this was a struggle over one gun, correct?

A   It was, yes.

Q   You didn't have your own gun that night, correct?

A   No, I did not.

Q   All right. The gun that you saw Mr. Marcy give to Mr. Brock, that was the only gun you saw that night?

A   Yes. That was the only gun I seen [sic] that night.

Q   And as far as you know, that's the only gun that went off that night?

A   As far as I know, yes.

. . . .

Q   So this wasn't a shootout where Mr. Brock had a revolver and you had a semi-auto[matic weapon]?

A   No. Absolutely not.

26 RP at 3469-70.

## C. Impeachment by the State

¶20 Immediately after this testimony, outside the jury's presence, the State asked that it "be allowed to impeach Mr. Garland with the prior inconsistent statement of his attorney in two prior trials." 26 RP at 3470. The trial court ruled that it would recess for a week to allow both parties to fully brief the issue.

¶21 At the next hearing, the State essentially argued that the defense had changed its theory from self-defense to accident and that the eleventh-hour change unfairly prejudiced the State. The defense steadfastly maintained that it never changed its defense theory and that no authority existed for impeaching a defendant with the opening statements of counsel in an earlier proceeding that resulted in a mistrial. Following argument, the trial court ruled that the State could impeach Garland in highly limited fashion:

> The State characterizes what happened as a change in the defense position. The defense characterizes it as a refinement. First question I ask myself is has there been a legal change in the defense, and I think there probably has, but if there is, it's a fairly minor one, because the line between excusable homicide and justifiable homicide is often an unclear line at best. And when people are struggling over a gun, you could say, well, the gun went off accidentally, making it excusable homicide. Or you could say, in this case, Mr. Garland reached for the gun and intended to grab it and use it in self-defense as the only way he could fend off the attack, and that would be justifiable homicide.
>
> So when you have facts such as this, there is, at least a change from the direction of justifiable to excusable, but I am not sure it's a huge change. But what is a huge change in my opinion is the factual difference in the case. This is not nuance in any way, shape, or form.
>
> The statement in the first case is, he took out the gun that he had, and he shot him. That's speaking of Mr. Garland, took out the gun he had, and he shot him.
>
> Now, in the most recent opening statement, we have [Garland] testifying, or [defense counsel] characterizing the evi-

dence as [Garland] was terrorized by Mr. Brock and Mr. Marcy, who pulled a gun on him in the parking lot at Bleacher's. There was a struggle for the gun. The gun went off. [Garland] was grabbing the hand of Mr. Brock and Mr. Marcy[,] trying to keep himself from being shot.

One situation, they've both got guns. Mr. Garland pulls out a gun and shoots. The other one, no gun in Mr. Garland's hands, and the gun goes off during a struggle. That is a major, significant, non-nuanced change in the case, so it invites impeachment.

Now, is there a policy reason behind this situation? And both sides are claiming, well, there's discovery issues that preclude either one side from using the evidence, or the one side in stopping the use of the evidence. And I find it almost comical to suggest that there's some kind of *Brady*[7] violation for use of your own opening statement that somehow you don't know that you've made an opening statement previously that said a completely different thing than what your client now has testified to? That doesn't fly, in the Court's mind.

. . . .

And you know, I believe there's a bigger argument . . . at stake here, and that's just the fairness and the integrity of this whole system. What if people from the public look in on this case, that know nothing about the history, or anything else, and what will the jurors think in the two cases when they find out, okay, in one case, they say one thing, and then they turn around in the next case and say something entirely different and nobody points it out? That's not fair. That's no way to resolve a legal dispute. That's no way to advance the truth seeking function. These things have to be brought to the jury. You just can't get away with saying one thing and then turning around and saying the almost exact opposite at a later time.

Now, are there attorney-client problems that kind of trump everything I just said? Well, as I indicated in my question to [defense counsel], there aren't any identified in the cases, but then on the other hand the cases don't really discuss the issue either. And I could see that if it were a more nuanced situation,

---

[7] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

if it were a question truly of refinement, or choosing the wrong words, or something of that sort, that there might be an attorney-client issue, but not here, not when it's this straightforward.

This doesn't invite some discussion of subjective interpretation of words. This is just a situation, there was one version told first time, and there's a completely different version told this time. That doesn't invite some explanation as to nuance.

Then, the final thing is, is there some difference between an opening statement made at a trial that's mistried, and a statement made in the course of pretrial discovery, or other pretrial matters? I would think that it's more clear-cut in this situation, even than in the cases that are cited by the State. I would think that there's more sanctity, more certainty in what you get up and tell a jury in open court than what you are talking about in a discovery hearing. So I don't think that that argument advances the defense's position. I think, if anything, it undercuts the defense's position.

So, for all the reasons that I have just talked about, I think the State is entitled to make the impeachment, or go forward with the impeachment that they are proposing to a degree.

27 RP at 3723-27.

¶22 Following this ruling, the defense argued that it needed a continuance in light of the court's "surprise ruling" because

I am going to have to testify in response to this impeachment. It's possible that I am going to have to put the two investigators on the stand to affirm that they told me, and that Mr. Garland never discussed with me the facts of the case, and the reason that occurs is this very reason. I haven't discussed the facts with him because I don't want somebody to come back and try to impeach him with that, but that's what the State is going to do, so I am going to have to testify, my two investigators are going to have to testify about how we work, and I mean, that's essential to deal with the cross-examination that the Court is allowing the State to do.

27 RP at 3743. The trial court responded that it would like to hear her offer of proof prior to ruling on a continuance. Defense counsel argued,

I think I made that, and essentially, the essence of it is that my knowledge of the facts of the case came from an investigator, did not come from Mr. Garland, and that's pretty much the essence. I have relied on the investigators to tell me what the facts were. I have not purposefully asked the defendant about that. So, any theory of the case was my theory of the case, not Mr. Garland's, and Mr. Garland is in no way responsible for the content of that.

27 RP at 3746.

¶23 After argument by the State, the trial court pointed out that "defense counsel's got an obligation to have a good-faith belief in the evidence before they say something to the jury"[8] and that

it's not really the belief of the defense counsel that raises the adoptive admission; it's the fact that Mr. Garland sat quietly in court for cases one and two, and allowed [his] defense attorney, even though the defense attorney may have been in good faith mistaken, to make representations that he now disavows.

27 RP at 3747-48.

¶24 Before the trial court ruled on the defense motion for a continuance, the defense brought a motion to reconsider the trial court's impeachment ruling, arguing, again, that prior case law did not support such a procedure. After again reminding defense counsel that she had the obligation to tell the truth and have a good-faith belief in all averments made to the jury, the following interaction occurred between the trial court and defense counsel:

THE COURT: . . . You can't mislead the State, can you? You can't lead them down one path and say, "Oh, aha, now it's really

---

[8] Rule 3.3(a) of the Rules of Professional Conduct states, for instance, that a lawyer shall not knowingly "(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer" or "(4) offer evidence that the lawyer knows to be false."

different than what I said." Maybe you don't have an obligation to come forward initially -- and I don't even agree with that proposition -- but you certainly must have an obligation not to speak one thing in an open courtroom setting and then turn around and proffer something completely different the next time you have an opportunity.

[Defense Counsel]: What --

THE COURT: That's not fair, is it?

[Defense Counsel]: I think it is.

THE COURT: Wow.

. . . .

THE COURT: What I am ruling is, you can't stand up and say one thing in one trial with the defendant present, and then stand up and say something completely different and him say it too in the next case, without having a consequence as a result. It's not fair. It's a change of position, and he can talk to you and say, you know, we need to talk because what you just said isn't right. You've got an obligation to be fair.

. . . .

. . . To be truthful.

27 RP at 3782-83. Defense counsel did not repeat her request for a continuance, ask that new counsel be substituted for her, or request that the trial court hear from the defense investigators or counsel herself either in camera or in court outside the jury's presence to clarify the reasons Garland was entitled to the relief she requested and to explain the basis of the different factual evidence and argument that arose for the first time in the third trial.

¶25 After denying defense counsel's motion for reconsideration, trial recommenced with Garland on the stand. The State impeached him as follows:

Q.   All right. So I will ask it again. You were in court on January 24th of 2007, and again on August 21st, 2007 when [defense counsel] made certain statements about the case, correct?

A.   Yes.

Q. All right. And both of those times [defense counsel] stated that you had your own gun that night, correct?

A. Yes.

Q. And both times [defense counsel] stated that Mr. Brock produced a revolver and pointed it at you, isn't that correct?

A. Yes.

Q. And both times [defense counsel] stated that you then took out your own gun and shot Mr. Brock; isn't that correct?

A. Yes, that's correct, she stated that.

27 RP at 3798-99.

¶26 After Garland's testimony, the defense rested without calling any defense investigators to clarify or explain the change in the factual representations regarding Garland's possession of a gun on the night of this incident between the statements made in the first two trials and Garland's testimony and counsel's representations in the third trial.

III. Impeachment By Prior Statements

A. Washington Law

¶27 A witness may be impeached as to their credibility by a prior inconsistent statement. *State v. Classen*, 143 Wn. App. 45, 59, 176 P.3d 582 (2008). This general rule applies with equal force to criminal defendants who testify. *State v. Johnson*, 53 Wn.2d 666, 670, 335 P.2d 809 (1959). "Impeachment is evidence, usually prior inconsistent statements, offered solely to show the witness is not truthful. Such evidence may not be used to argue that the witness is guilty or even that the facts contained in the prior statement are substantively true." *State v. Burke*, 163 Wn.2d 204, 219, 181 P.3d 1 (2008) (citation omitted). And as ER 613(b) states,

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party

is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

¶28 ER 801(d)(2) governs party-opponent admissions. Such admissions are treated somewhat differently as they constitute a special "subset" of prior inconsistent statements. ER 801(d)(2) explains that such admissions are not hearsay when

[t]he statement is offered against a party and is (i) the party's own statement, in either an individual or a representative capacity or (ii) a statement of which the party has manifested an adoption or belief in its truth, or (iii) a statement by a person authorized by the party to make a statement concerning the subject, or (iv) a statement by the party's agent or servant acting within the scope of the authority to make the statement for the party, or (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

¶29 Prior inconsistent statements generally do not constitute substantive evidence—they may be considered only to determine witness credibility—whereas party-opponent admissions may be admitted as substantive evidence. *See, e.g., Saldivar v. Momah*, 145 Wn. App. 365, 400, 186 P.3d 1117 (2008).

¶30 Although there are no Washington cases directly addressing whether a defendant may be impeached by the opening statements of trial counsel from an earlier proceeding that resulted in a mistrial, both parties acknowledge that *State v. Rivers*, 129 Wn.2d 697, 921 P.2d 495 (1996), *State v. Dault*, 19 Wn. App. 709, 578 P.2d 43 (1978), and *State v. Acosta*, 34 Wn. App. 387, 661 P.2d 602 (1983), *rev'd on other grounds*, 101 Wn.2d 612, 683 P.2d 1069 (1984), touch on the subject of impeaching a defendant with pretrial or opening statements.

¶31 In both *Dault* and *Acosta*, our courts held that defense counsel's statements made at an omnibus hearing

were attributable to the defendant as "quasi-admissions" and could be used as prior inconsistent statements for purposes of impeachment if the defendant testified. *Dault*, 19 Wn. App. at 717-18; *Acosta*, 34 Wn. App. at 391-92. *Dault* stressed that

> of considerable importance is the fact that the attorneys' revelations were made in the presence of their clients. Both defendants were present in court at the omnibus hearing. Although the form suggested by [an omnibus hearing] may not be such as would cause the defendants to speak out, they could have consulted with their counsel if in fact the defense was otherwise.

19 Wn. App. at 718.

¶32 *Rivers* extended the reasoning of *Dault* and *Acosta* and held that a trial court did not abuse its discretion in allowing the State to impeach a defendant with remarks made by his attorney in opening argument (of the same trial). *Rivers*, 129 Wn.2d at 709.

¶33 Here, Garland contends that the trial court abused its discretion in allowing the State to impeach him with his counsel's opening statements because *Dault, Acosta,* and *Rivers* do not specifically address impeaching a defendant with an attorney's opening remarks from a proceeding that resulted in a mistrial. Br. of Appellant at 23 ("Thus, the current state of the law in Washington is that the opening statement made by defense counsel in a criminal trial is admissible to impeach the defendant **in that same trial** if the defendant offers testimony which contradicts the statements made in opening argument."). In addition to noting this distinction, Garland argues that his defense attorney's remarks involved inconsistent defenses—a situation where impeachment is inappropriate.

¶34 As explained in *State v. Williams*, 79 Wn. App. 21, 28-29, 902 P.2d 1258 (1995),

> Generally, an attorney representing a client in litigation is authorized to speak for the client concerning that litigation.

Thus, an attorney's statement concerning the litigation some-times qualifies, when offered against the client, as the admission of a party opponent. *Acosta*, 34 Wn. App. at 392; *State v. Dault*, 19 Wn. App. 709, 715-18, 578 P.2d 43 (1978); [*City of*] *Seattle v. Richard Bockman Land Corp.*, 8 Wn. App. 214, 216, 505 P.2d 168 (quoting *Brown v. Hebb*, 167 Md. 535, 175 A. 602, 97 A.L.R. 366 (1934)), *review denied*, 82 Wn.2d 1003 (1973). In criminal cases, however, this rule should be applied with caution, in part due to the danger of impairing the right to counsel. *United States v. Harris*, 914 F.2d 927, 931, 117 A.L.R. Fed. 877 (7th Cir. 1990); *United States v. Valencia*, 826 F.2d 169, 172 (2d Cir. 1987).

Although an attorney's statement may sometimes qualify as an admission of the client when offered against the client, it does not qualify when the attorney is pleading alternatively or inconsistently on the client's behalf.

¶35 The State counters that the trial court did not abuse its discretion because ER 613(b) "merely refers to prior statements and does not refer to statements made in trial or opening," essentially arguing that absent the "inconsistent defense theory" situation presented in *Williams*, we should extend the *Acosta/Dault* reasoning to all pretrial (or mistrial) representations made by an attorney on behalf of her client. Br. of Resp't at 18. Moreover, the State asserts that Garland's highly divergent opening statements did not function primarily to give opposing counsel notice of the defendant's proposed theory of the case (as occurred in the *Williams* omnibus hearing) but were directed primarily at the jury. Instead, the opening statements were "legally consistent, reasserting the defense of general denial [and self defense]. The difference was that defense counsel's prior opening statements and Garland's testimony were factually incompatible with the opening statement and Garland's testimony in the third trial." Br. of Resp't at 21 (alteration in original) (citation omitted).

¶36 If we were to accept Garland's broad argument, either party could well suffer prejudice by being confronted with substantively different theories *and factual represen-*

*tations* during subsequent trials that presumably address the facts established during discovery, trial preparation, and earlier trial proceedings. Alternatively, under the State's view, clients risk being held responsible for all averments made by their counsel in the course of pretrial litigation or opening statements. Neither outcome is ideal.

### B. Federal Case Law Guidance—*United States v. McKeon*

¶37 Although neither party briefed the Second Circuit's decision in *McKeon*, it addresses a highly similar set of facts and arrives at a "middle ground" solution to the dilemma of counsel's inconsistent opening statements in subsequent trials.

¶38 Following two mistrials, Bernard McKeon was convicted in the Eastern District of New York for conspiracy to export firearms, contrary to 18 U.S.C. § 371. *McKeon*, 738 F.2d at 27-28. On appeal, the Second Circuit considered whether the trial court erred in admitting "into evidence at the third trial . . . portions of the opening statement made by McKeon's lawyer at the second trial." *McKeon*, 738 F.2d at 28.

¶39 In the second trial, McKeon's counsel stated in opening that a Xerox machine McKeon and his wife purportedly used in the commission of the crime was not the same type of machine that the State alleged McKeon used to commit the crime. *McKeon*, 738 F.2d at 28. In the third trial, however, McKeon's counsel stated in opening that McKeon's wife had used the Xerox machine with benign intent as a favor to the actual guilty party (one John Moran). *McKeon*, 738 F.2d at 28. Outside the jury's presence, the State successfully moved to introduce portions of the opening statement in the second trial as party-opponent admissions by his trial counsel imputed to McKeon. *McKeon*, 738 F.2d at 28.

¶40 The Second Circuit upheld this decision but in doing so, carefully articulated its reasons. First, the court stated,

We believe that prior opening statements are not *per se* inadmissible in criminal cases. To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system itself by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact.

*McKeon*, 738 F.2d at 31.

¶41 In refusing to adopt a per se rule of inadmissibility, the court reasoned that the evidentiary use of prior jury argument should be circumscribed to avoid conflict with other important public policies:

First, the free use of prior jury argument might consume substantial time to pursue marginal matters. Some witnesses may be available only at one trial, their testimony may change or other evidence may differ. Trial tactics may also change because of the earlier trial. If prior jury argument may be freely used for evidentiary purposes, later triers of fact will be forced to explore the evidence offered at earlier trials in order to determine the quality of the inconsistency between positions taken by a party. This will result in a substantial loss of time on marginal issues, diversion from the real issues and exposure to evidence which may be otherwise inadmissible and prejudicial.

Second, inferences drawn from an inconsistency in arguments to a jury may be unfair. In criminal cases, the burden rests on the government to present a coherent version of the facts, and defense counsel may legitimately emphasize the weaker aspects of the government's case. Where successive trials occur, the evidentiary use of earlier arguments before the jury may lead to seemingly plausible but quite prejudicial inferences. A jury hearing that in the first trial defense counsel emphasized the weakness of the prosecution's case as to the defendant's criminal intent, may well, when lack of proof of identity is argued at the second, be misled as to the government's obligation to prove all the elements at both trials.

Third, the free use of prior jury argument may deter counsel from vigorous and legitimate advocacy. Argument to the jury is

a crucial aspect of any trial, and the truth-seeking process itself demands that the professional adversaries be allowed to put before the trier of fact all relevant argument regarding the inferences or factual conclusions possible in a particular case. Counsel should not, except when the truth-seeking purpose clearly demands otherwise, be deterred from legitimate argument by apprehension about arguments made to a jury in an earlier trial.

Fourth, where an innocent factual explanation of a seeming inconsistency created by the prior opening statement exists, the offer of that explanation may seriously affect other rights of the defense. Where the explanation may be offered to the trier of fact only through the defendant as a witness, the defendant may have to choose between forgoing the explanation or facing the introduction of a prior criminal record for impeachment purposes and waiver of the attorney-client privilege. Even if defense counsel can offer the explanation in a hearing under Fed. R. Evid. 104(a) outside the presence of the jury, that offer may expose work product, trial tactics or legal theories to the prosecution. These Hobson's choices may thus seriously impair the defense.

Fifth, as is clear from our disposition of this case, the admissibility of a prior opening statement may lead to the disqualification of counsel chosen by the defendant, a most serious consequence.

*McKeon*, 738 F.2d at 32-33.

¶42 In light of its articulated concerns, the court held,

For these reasons, we circumscribe the evidentiary use of prior jury argument. Before permitting such use, the district court must be satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial. Speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the prosecution's case or invitations to a jury to draw certain inferences should not be admitted. The inconsistency, moreover, should be clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial. The court must further determine that the statements of counsel were

such as to be the equivalent of testimonial statements by the defendant. The formal relationship of the lawyer as agent and the client as principal by itself will rarely suffice to show this since, while clients authorize their attorneys to act on their behalf, considerable delegation is normally involved and such delegation tends to drain the evidentiary value from such statements. Some participatory role of the client must be evident, either directly or inferentially as when the argument is a direct assertion of fact which in all probability had to have been confirmed by the defendant.

Finally, the district court should, in a Fed. R. Evid. 104(a) hearing outside the presence of the jury, determine by a preponderance of the evidence that the inference the prosecution seeks to draw from the inconsistency is a fair one and that an innocent explanation for the inconsistency does not exist. Where the evidence is in equipoise or the preponderance favors an innocent explanation, the prior opening statement should be excluded. We impose this requirement so as to allow leeway for advocacy and to lessen the burden of choice between the defendant's not explaining the inconsistency to the jury or sacrificing other valuable rights. Moreover, where the attorney-client privilege, the privilege against self-incrimination, the fear of impeachment by a prior conviction, apprehension over having to change attorneys, the revelation of work product, trial tactics, or legal theories of defense counsel may be involved in explaining the changes in the defendant's version of events, the court should offer an opportunity to the defense to present those reasons *in camera*, outside the presence of the jury and of the prosecution. *In camera* hearings are permitted where the government seeks to use grand jury testimony to overcome the attorney-client privilege or work product immunity, *In re John Doe Corp.*, 675 F.2d 482, 489-91 (2d Cir. 1982), and similar considerations apply in the present circumstances.

*McKeon*, 738 F.2d at 33.

¶43 Although not binding on us, the Second Circuit's proposed rule provides parameters for our analysis.[9] And in

---

[9] Although the Second Circuit chose to treat defense counsel's opening statements as party-opponent admissions (and, therefore, as substantive evidence),

applying the Second Circuit's proposed rule to the record here, we see that the trial court carefully concluded that the inconsistency in Garland's opening statements was clear and unambiguous and that Garland had ample time to confirm or deny the assertions in the two years between the second and third trials. Thus, an innocent explanation for the inconsistency of counsel's statements was not apparent to the trial court. And the inconsistency between the statements was of such quality that it obviated any need for the trial court to explore other events at the prior trials. It would also appear that the statements of counsel were such as to be the equivalent of testimonial statements by Garland about the facts surrounding the shooting. Moreover, the trial court made this determination outside of the jury's presence, alleviating some of the concerns raised by both Garland's defense counsel and the *McKeon* court.

¶44 Here, the record reflects that the trial court gave defense counsel ample time and opportunity to clarify why the factual inconsistencies occurred between Garland's second and third trials. Rather than substantively address whether Garland had a participatory role in this change, ask for an in camera hearing,[10] call the defense investigators to the stand outside the presence of the jury (or even in the jury's presence when impeachment was allowed) to clarify the basis of the change in material representations, or withdraw in light of a potential conflict, defense counsel simply reiterated that she thought the law would not allow for impeachment. Losing this argument, she moved on with trial.[11]

---

this approach would also lend itself to helping courts determine whether prior opening statements should be allowed as inconsistent statements for impeachment purposes.

[10] We are confident that defense counsel knew how to utilize an in camera procedure and that the trial court was amenable to this process: at sentencing, defense counsel successfully asked the trial court for such a hearing on an unrelated matter.

[11] Garland has not raised an ineffective assistance of counsel claim in this appeal. Thus, we do not address whether a communication breakdown or other

¶45 Under the *McKeon* analysis, even allowing leeway for advocacy and lessening the burden of choice between Garland not explaining the inconsistency to the jury or sacrificing other valuable rights, the admission of this impeachment evidence was not an abuse of the trial court's discretion.

C. No Abuse of Discretion To Allow Impeachment Here

¶46 In considering the *McKeon* analysis and our United States Supreme Court's acknowledgement as early as 1880 that a clear and unambiguous admission of fact made by an attorney in an opening statement could have binding effect on a client, *Oscanyan v. Arms Co.*, 103 U.S. (13 Otto) 261, 263, 26 L. Ed. 539 (1880), we hold that it is consistent with Washington law that the trial court's decision in this case to allow limited impeachment was not manifestly unreasonable, exercised on untenable grounds, or involved his adopting a view "that no reasonable person would take." *Lewis*, 115 Wn.2d at 298-99. Accordingly, we hold that the trial court did not abuse its discretion in allowing limited impeachment of Garland through use of his counsel's opening statements of fact in the first two trials.

¶47 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

JOHANSON, A.C.J., and ARMSTRONG, J., concur.

---

tactical decisions leading to Garland's impeachment in trial or whether any of counsel's conduct constituted ineffective assistance. We note that Garland may bring such a claim in a personal restraint petition under RAP 16.4.