FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 MAY 13 AM 8: 26

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 68158-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JEFFREY M. KINZLE, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 13, 2013 |
| | ) | |

LEACH, C.J. — Jeffrey Kinzle appeals his conviction for indecent liberties by forcible compulsion. He challenges the court's decision to deny his motion to substitute counsel, the court's determination that it had no reason to doubt his competence to stand trial, and the sufficiency of the evidence. He also alleges prosecutorial misconduct, that his indeterminate sentence is unconstitutional, evidence fabrication, juror bias, witness perjury, erroneously excluded evidence, and violation of his Miranda[1] rights. Finding no merit in Kinzle's arguments, we affirm the conviction. Because we accept the State's concession that the court improperly imposed seven of the community custody conditions, we remand for striking the offending conditions from Kinzle's judgment and sentence.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

FACTS

On March 13, 2011, the complaining witness[2] was working alone in a small grocery store when two males, whom she had not seen before, entered the store. At that time, there were no other customers in the store. One of the men, Jeffrey Kinzle, asked her to show him where to find the cans of jalapeño peppers. As she led the men toward the canned food area, Kinzle grabbed her buttocks.[3] She asked Kinzle what was going on, and he responded with laughter. The complaining witness told him to pay for the jalapeños and to leave the store. She and Kinzle walked to the cash register.

Shortly afterward, the other man, Nathan Wood, asked the complaining witness to show him where the chipotle peppers were located. As she neared that area of the store, Kinzle grabbed her from behind and took her to the canned food area. He held her around the waist, squeezed her buttocks and breast, pulled on her clothing, kissed her neck, and rubbed his penis against her. As she tried to resist, she ended up face-to-face with Kinzle. She tried to push him away and yelled in Spanish for him to let her go. During the incident, Wood remained in a separate area of the aisle and did not observe what took place. After Wood heard the complaining witness scream, "like [Kinzle] was attacking her," Wood

---

[2] The court granted Kinzle's motion to prohibit the State or witnesses from referring to the "victim." Instead, the court directed the parties to refer to her as the "store employee" or "complaining witness."

[3] The charges in this case do not concern this act.

saw Kinzle run out of the store. The complaining witness ran out of the store and yelled for help. A bystander helped her call the police.

When the police arrived, Wood told them that Kinzle, his roommate, attacked the complaining witness. Wood escorted the police to their apartment. The police questioned Kinzle, arrested him, and transported him to the store. After viewing Kinzle outside the store, the complaining witness said that she was confused and did not know whether he was the person who attacked her.

The State charged Kinzle with indecent liberties by forcible compulsion. Before trial, Kinzle moved to substitute counsel. After two hearings on the matter in July 2011, the court denied the motion.

In August 2011, the State moved to clarify a potential conflict of interest between Kinzle and his attorney. The State received information that Kinzle threatened his attorney and threatened to blow up government buildings and to kill various people, including the president, police officers, and corrections deputies. In its motion, the State cautioned, "The State has also considered that the Defendant may be deliberately manufacturing a situation that would compel replacement of his attorney." Kinzle's attorney expressed confidence in her ability to continue representing him. On October 31, 2011, during motions in limine, the court raised the issue presented in the State's earlier motion. After a

colloquy with Kinzle and his attorney, the court decided that Kinzle's attorney would continue to represent him.

Kinzle did not testify at trial. The complaining witness testified through an interpreter. She testified that when Kinzle entered the store, he had brown hair and blue eyes and wore a hat, blue pants, a jacket, brown shoes, and a red or burgundy sweatshirt. He also had "a little bit of a beard." When the police brought Kinzle to the store later that evening, he was clean-shaven. Her testimony at trial included details that she did not reveal to police during earlier interviews. At trial, she stated that Kinzle asked her if she wanted to feel his penis, that his fly was down during the incident, and that she could feel that he had an erection when he rubbed himself against her.

Wood testified that Kinzle did not appear differently when he was arrested than he appeared at the time of the incident. Michael Flavin, Kinzle's other roommate, testified that before the police arrived at the apartment, Kinzle shaved and removed his hat and a gray fleece jacket that had dark sleeves and put on a sweatshirt. Brent Vannoy, who was in jail with Kinzle, also testified for the State. He told the court that Kinzle planned to "beat[] his charge" by shaving after the incident and by acting "crazy and stuff for the Court so they thought he was looney and get away with what he did."

A jury convicted Kinzle as charged. He had an offender score of five, a total standard range of 77-102 months, and a maximum life term. The court sentenced Kinzle to an indeterminate sentence, with a minimum sentence of 102 months of confinement and a maximum sentence of life imprisonment. The sentence included 21 conditions of community custody. Kinzle appeals.

ANALYSIS

Motion To Substitute Counsel

Kinzle first claims that the trial court denied him effective assistance of counsel when it denied his motion for new counsel. He asserts that he and his attorney had "an ongoing, intractable conflict" that "amounted to a total breakdown in communications." He argues that "instead of inquiring into that conflict," the court improperly focused its inquiry on trial counsel's competence. The State counters that Kinzle's concerns "related primarily to tactics, strategy and his lost confidence in his attorney."

We review for abuse of discretion a trial court's decision to deny a motion to substitute counsel.[4] If the attorney-client relationship "completely collapses, the refusal to substitute new counsel violates the defendant's Sixth Amendment right to effective assistance of counsel."[5] A defendant "'must show good cause'"

_____

[4] State v. Stenson, 132 Wn.2d 668, 733, 940 P.2d 1239 (1997) (Stenson I).

[5] In re Pers. Restraint of Stenson, 142 Wn.2d 710, 722, 16 P.3d 1 (2001) (Stenson II) (citing United States v. Moore, 159 F.3d 1154, 1158 (9th Cir. 1998)).

before the trial court will allow substitution of counsel, "'such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant.'"[6]

A defendant is not entitled to a particular lawyer with whom he thinks he can have a meaningful attorney-client relationship.[7] A general loss of confidence or trust alone is insufficient to substitute new counsel.[8] The attorney and the defendant must be "so at odds as to prevent presentation of an adequate defense."[9] To determine whether the trial court properly denied Kinzle's motion to substitute counsel, we consider (1) the nature and extent of the alleged conflict, (2) the adequacy of the court's inquiry, and (3) the timeliness of the motion.[10] We hold that the trial court did not abuse its discretion when it denied Kinzle's motion.

Regarding the first factor, we analyze both (1) the nature and extent of the breakdown in communication between the attorney and the client and (2) the breakdown's effect on the representation that the client actually received.[11]

---

[6] State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004) (quoting Stenson I, 132 Wn.2d at 734).
[7] Moore, 159 F.3d at 1158.
[8] Varga, 151 Wn.2d at 200 (citing Stenson I, 132 Wn.2d at 734).
[9] Stenson I, 132 Wn.2d at 734.
[10] Stenson II, 142 Wn.2d at 723-24.
[11] Stenson II, 142 Wn.2d at 724.

Kinzle fails to show that any alleged breakdown in communications satisfies the first factor.

Kinzle addressed the trial court during two hearings on the motion. He stated his belief that he would not receive "fair representation." He asserted, "I've asked her to obtain various bits of evidence, having swabs retested on our own, speaking with several people, things that would be of value to my case. I've been told on several of them that either she doesn't have time or it wouldn't be worth it in trial."[12] Furthermore, he explained, "And in regards to the communication, I've never refused to speak with her. I—we have had a lot of communication problems and I will be the first to say I—there's times where I get angry . . . I give up on talking right now." Although Kinzle told the court that his attorney acted in "an almost strong-arm manner" to convince him to accept a plea deal, the court noted that he did not accept a plea offer. Kinzle also physically threatened his attorney and told the court that he believed "she works for the same fucking people that are trying to give me life [in prison]."

After the court granted a continuance for Kinzle and his attorney to "work this out," Kinzle told the court that he had spoken with his attorney. When the trial court denied the motion to substitute counsel, it noted that Kinzle's attorney was investigating all of his witnesses in the matter and that she and Kinzle were

---

[12] During motions in limine, the court granted the State's motion to exclude any evidence related to this incident that Kinzle sought to address.

able to communicate at that point. The court explained, "There may be some differences getting ready for trial tactics and whatnot, but that's not a reason to switch horses in midstream." Later, at a hearing on the State's motion to clarify a potential conflict of interest, the court determined that it "simply would treat any threats made as a product of somebody being upset at the moment" and that no evidence suggested that Kinzle's attorney would be unable to adequately represent him. Moreover, the court noted, "He's indicated today that he's comfortable having Ms. Trueblood continue to represent him."

Counsel has wide latitude to control trial strategy and tactics.[13] "'Counsel is not, at the risk of being charged with incompetence, obliged to raise every conceivable point, however frivolous, damaging or inconsequential it may appear at the time, or to argue every point to the court and jury which in retrospect may seem important to the defendant.'"[14] Posttrial scrutiny of an attorney's trial tactics would cause the attorney to "'lose the very freedom of action so essential to a skillful representation of the accused.'"[15]

Kinzle told the court that he would only temporarily refuse to communicate with his attorney when he would become angry. He did not accept a plea deal, and nothing in the record indicates any communication problems during trial. His

---

[13] Stenson II, 142 Wn.2d at 733.

[14] Stenson II, 142 Wn.2d at 735 (quoting State v. Piche, 71 Wn.2d 583, 590, 430 P.2d 522 (1967)).

[15] Stenson II, 142 Wn.2d at 735 (quoting Piche, 71 Wn.2d at 590).

remaining arguments that he offered to support his motion pertained merely to his attorney's unwillingness to offer all of the evidence that he desired. When the court addressed the State's concern about the alleged threats, it determined that the threats were likely due to Kinzle's anger at the moment and that he did not object at that time to having his attorney continue to represent him. For these reasons, the nature and extent of the alleged conflict weighs against finding an abuse of discretion.

The second factor, the adequacy of the trial court's inquiry, appears sufficient. At two separate hearings, the court allowed Kinzle to state his concerns and allowed both his attorney and the prosecutor to respond. Despite Kinzle's assertion that the court did not address his concerns meaningfully, the court explained clearly that his lack of cooperation with his attorney was not a sufficient basis to fire her and that he had to show good cause. Kinzle's attorney told the court that she had "done substantial investigation," that she thought she was "more than competent to handle this case," and that at that point she "ha[d] done everything that is required." Because the court allowed Kinzle to express his concerns fully, inquired into them appropriately, and properly concluded that his attorney was investigating the case adequately, Kinzle fails to show that the court's inquiry was insufficient.

Finally, we consider the third factor, the motion's timeliness. Kinzle's motion was timely. To assess the timeliness of a motion to substitute counsel, we balance the "'resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice.'"[16] Because Kinzle moved over three months before trial, the court had adequate time to investigate the matter and to appoint new counsel, if necessary.[17]

Having reviewed the three relevant factors, we conclude that the trial court did not err when it denied Kinzle's request for substitute counsel.

Competence

Kinzle also contends that the trial court should have conducted a competency hearing because "the judge had substantial evidence before trial of Mr. Kinzle's questionable competency." He points to his statement during the hearing on the motion to substitute counsel that he had a "past mental health history." He also highlights the prosecutor's statement during the hearing on the State's motion to clarify a potential conflict that Kinzle, while speaking to other inmates, made a series of threats to blow up government buildings and to kill various people.

---

[16] Moore, 159 F.3d at 1161 (quoting United States v. D'Amore, 56 F.3d 1202, 1206 (9th Cir. 1995)).

[17] See Moore, 159 F.3d at 1161 (motions were timely when made over one month and over two weeks before trial); D'Amore, 56 F.3d at 1206 (motion on eve of trial was timely when defendant attempted to contact the court 10 days before the hearing).

We review for abuse of discretion a trial court's threshold determination about the existence of any reason to doubt a defendant's competence to stand trial.[18] Under RCW 10.77.050, an incompetent person may not be tried, convicted, or sentenced for committing an offense so long as the incapacity continues. Under RCW 10.77.010(15), "incompetency" means that a person "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." When a reason exists to doubt the defendant's competence,

> the court on its own motion or on the motion of any party shall either appoint or request the secretary [of the department of social and health services] to designate at least two qualified experts or professional persons, one of whom shall be approved by the prosecuting attorney, to examine and report upon the mental condition of the defendant.[19]

These procedures are mandatory.[20] If the court fails to follow the procedures to protect an accused's right not to be tried while incompetent, it denies the accused his due process rights.[21]

A trial court generally maintains discretion in assessing whether or not to order a competency examination.[22] In making such a determination, the court

---

[18] City of Seattle v. Gordon, 39 Wn. App. 437, 442-43, 693 P.2d 741 (1985).

[19] Former RCW 10.77.060(1)(a) (2004).

[20] In re Pers. Restraint of Fleming, 142 Wn.2d 853, 863, 16 P.3d 610 (2001) (citing State v. Wicklund, 96 Wn.2d 798, 805, 638 P.2d 1241 (1982)).

[21] Fleming, 142 Wn.2d at 863 (citing State v. O'Neal, 23 Wn. App. 899, 901, 600 P.2d 570 (1979)).

may consider such factors as the defendant's appearance, demeanor, conduct, personal and family history, past behavior, medical and psychiatric reports, and counsel's statements.[23] It should give "considerable weight" to the defense attorney's opinion regarding a client's competence and ability to assist in his defense.[24] "Washington cases have taken the position that a trial court does not abuse its discretion if competency issues are raised."[25]

We hold that the trial court did not abuse its discretion when it did not order a competency examination. At sentencing, the court recognized that Kinzle suffered from mental health issues. But no evidence suggests that, during trial, Kinzle was unable to understand the nature of the proceedings or to assist in his own defense. In fact, when Kinzle addressed the court, the opposite appeared true. Additionally, during trial, Brent Vannoy testified that while he and Kinzle were in jail together, Kinzle sought to act "crazy and stuff" to "beat[] his charge." Despite Kinzle's argument that this testimony occurred "after the judge had

---

[22] Fleming, 142 Wn.2d at 863 (citing State v. Thomas, 75 Wn.2d 516, 518, 452 P.2d 256 (1969)).

[23] Fleming, 142 Wn.2d at 863 (quoting State v. Dodd, 70 Wn.2d 513, 514, 424 P.2d 302 (1967)).

[24] Gordon, 39 Wn. App. at 442.

[25] Fleming, 142 Wn.2d at 864; see also State v. Lord, 117 Wn.2d 829, 901-04, 822 P.2d 177 (1991) (defendant's statements about his conversations with the devil and conflicts with his attorney do not create a reason to doubt defendant's competence); State v. Walker, 13 Wn. App. 545, 549, 536 P.2d 657 (1975) (uncommunicated history of prior mental health treatment did not warrant reversal).

significant reason to doubt Mr. Kinzle's competency," the alleged threats did not provide a sufficient factual basis to conclude that Kinzle was incompetent. Moreover, Kinzle's attorney did not file a motion for an examination or otherwise indicate that Kinzle was incompetent, although she had many opportunities to confer with Kinzle before trial and to assess his competence.

Sufficiency of the Evidence

For his third claim, Kinzle contends that the record contains insufficient evidence for a rational juror to find forcible compulsion beyond a reasonable doubt. Under RCW 9A.44.100(1)(a), a person is guilty of indecent liberties when he knowingly causes another person who is not his spouse to have sexual contact with him by forcible compulsion. "Forcible compulsion" is physical force that overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself, or in fear that she will be kidnapped.[26] It is "not the force inherent in any act of sexual touching, but rather is that 'used or threatened to overcome or prevent resistance by the female.'"[27] Whether the evidence establishes resistance is "a fact sensitive determination based on the totality of the circumstances, including the [complaining witness's]

---

[26] RCW 9A.44.010(6).
[27] State v. Ritola, 63 Wn. App. 252, 254-55, 817 P.2d 1390 (1991) (quoting State v. McKnight, 54 Wn. App. 521, 527, 774 P.2d 532 (1989)).

words and conduct."[28] "Indecent liberties by forcible compulsion is a class A felony."[29]

In a challenge to the sufficiency of the evidence, we view all facts and reasonable inferences in the light most favorable to the State to determine whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt.[30] We defer to the trial court on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence.[31] The State may establish a crime's elements by either direct or circumstantial evidence, one being no more or less valuable than the other.[32] A challenge to the sufficiency of the evidence admits the truth of the State's evidence.[33]

Kinzle asserts that "both [the complaining witness's] testimony and that of Mr. Wood show that the encounter between Mr. Kinzle and [the complaining witness] ended as soon as she began to resist." He compares this case to State v. Ritola.[34] In Ritola, the State charged a juvenile resident of Toutle River Boys Ranch with one count of indecent liberties by forcible compulsion after he

---

[28] McKnight, 54 Wn. App. at 526.

[29] RCW 9A.44.100(2)(b).

[30] State v. Embry, 171 Wn. App. 714, 742, 287 P.3d 648 (2012) (citing State v. Yarbrough, 151 Wn. App. 66, 96, 210 P.3d 1029 (2009)), petition for review filed, No. 88162-6 (Wash. Mar. 11, 2013).

[31] State v. Raleigh, 157 Wn. App. 728, 736-37, 238 P.3d 1211 (2010) (citing State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004)).

[32] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

[33] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[34] 63 Wn. App. 252, 817 P.2d 1390 (1991).

"suddenly grabbed" a female counselor's breast, "squeezed it, then 'instantaneously' removed his hand," and said, "Nice tits."[35] The court held this evidence insufficient to prove forcible compulsion.[36] There was no evidence of an express or implied threat.[37] Additionally, it was "undisputed that Ritola used the force necessary to touch the counselor's breast, but as noted, that is not enough for forcible compulsion. There is no evidence that the force he used overcame resistance, for he caught the counselor so much by surprise that she had no time to resist."[38] The force Ritola used was not directed at overcoming resistance and was not more than necessary to accomplish sexual touching.[39]

Here, it is undisputed that Kinzle did not threaten the complaining witness. The facts in this case, however, are distinguishable from Ritola. Wood testified that he saw Kinzle run away after hearing the complaining witness scream. Because he was in a separate area of the store during the incident, he did not actually see Kinzle touch her. The complaining witness testified,

> [H]e grabbed me from my back. He—he held me by force. He was behind me. He was pulling me as I tried to turn and be in front of him, but he—he put me by the can area.

---

[35] Ritola, 63 Wn. App. at 253.
[36] Ritola, 63 Wn. App. at 255.
[37] Ritola, 63 Wn. App. at 255.
[38] Ritola, 63 Wn. App. at 255.
[39] Ritola, 63 Wn. App. at 255-56.

> At that moment, he was touching my buttocks, my breast, he was pulling my clothing. He was trying to kiss me. He was rubbing his penis against me.

She told the court, "[H]e grab me, and he was behind me grabbing me. And at that moment, I tried—I resist, but I turn around and I—I ended up facing face-to-face." She also testified, "One hand—it was right here by my waist. The other hand he was touching my—both of my breast, and he was pulling my clothes. Then I was pushing him away, and I told him to let me go." Finally, she stated that the incident ended "because I push him away as much as I could. I tried to push him back," and that it was difficult to push him.

Viewing the facts and reasonable inferences from them in the light most favorable to the State, Wood's testimony would not require a rational trier of fact to reasonably doubt that the interaction ended as soon as the complaining witness began to resist. Unlike Ritola, the complaining witness's testimony does not establish that Kinzle "instantaneously" released her. Rather, her testimony supports the State's theory that Kinzle overcame her resistance as she initially tried to break free, when she ended up facing him. He also directed his acts at overcoming her resistance. Kinzle took her to a separate location from where he grabbed her, touched her, pulled on her clothing, and rubbed himself against her as she tried to push him away. Although she eventually broke free, her testimony would allow a rational trier of fact to find forcible compulsion beyond a reasonable doubt.

-16-

NO. 68158-3-I / 17

Prosecutorial Misconduct

Kinzle also alleges that the prosecutor "compensated for the State's lack of evidence of forcible compulsion by using inflammatory, prejudicial argument during closing" by "improperly argu[ing] facts not in evidence." The prosecutor stated,

> We're not here accusing the defendant of rape, but we could have been had she not got away. We're not alleging some assault with serious injury. That could have happened too.
>
> What I said yesterday morning is it was fortunate that she got away and that it wasn't actually worse than it was. But a crime had already been committed. Crime I'm talking about is indecent liberties. That's what the defendant's charged with. And there may have been small crime before that with a butt grab. And it could have been worse crimes after that; fortunately, that's not what happened.

Kinzle contends that because there was no evidence that he intended to injure the complaining witness or to commit "worse crimes" against her, the prosecutor urged the jury to convict him based upon a fear of what could have happened. He claims that the comments were prejudicial because "the argument the prosecutor used allowed the jury to overlook the facts and convict Mr. Kinzle based on the belief that he was more dangerous than the evidence showed." Kinzle also asserts that the conduct was repetitive based on the prosecutor's comment, "What I said yesterday morning."

-17-

To succeed on a claim of prosecutorial misconduct made for the first time on appeal, the appellant must show that the prosecutor's behavior was "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury."[40] To prove prosecutorial misconduct, an appellant must show both improper conduct and resulting prejudice.[41] Conduct is not flagrant and ill-intentioned where a curative instruction could have cured any error.[42] "But the cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect."[43] "Mere appeals to a jury's passion and prejudice are inappropriate."[44] Prejudice exists where there is a substantial likelihood that the misconduct affected the verdict.[45] We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions.[46]

Even if the prosecutor's statements were improper, Kinzle fails to show a substantial likelihood that they affected the verdict. Viewed in the context of the

---

[40] State v. Gentry, 125 Wn.2d 570, 596, 888 P.2d 1105 (1995).
[41] State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).
[42] State v. Walker, 164 Wn. App. 724, 737, 265 P.3d 191 (2011).
[43] Walker, 164 Wn. App. at 737.
[44] State v. Smith, 144 Wn.2d 665, 679, 30 P.3d 1245, 39 P.3d 294 (2001).
[45] State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).
[46] State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

total argument, the prosecutor recited the law directly from the jury instructions and noted that the State bears the burden of proof. He properly discussed the "beyond a reasonable doubt" standard. The State also presented a very strong case. Wood, who was with Kinzle in the store, and Kinzle's roommate, Michael Flavin, identified Kinzle. A witness who was in jail with Kinzle testified that Kinzle planned to "beat[] his charge" by acting crazy and by changing his appearance after the incident. The contrary evidence primarily showed that the complaining witness provided a statement that she was not positive about her identification and gaps in her memory regarding details of the incident. Because Kinzle fails to demonstrate prejudice, we reject his prosecutorial misconduct claim.

Kinzle's Indeterminate Sentence

Kinzle also argues that his indeterminate sentence violates the Eighth Amendment's ban on cruel and unusual punishment[47] and the prohibition against cruel punishment in article I, section 14 of the Washington Constitution. Kinzle does not challenge on its face the constitutionality of the "sentencing of sex offenders" statute, RCW 9.94A.507. Rather, he claims that the nature of his crime is disproportionate to his sentence, which subjects him to lifetime confinement or supervision. He states that he "received this life sentence for an

---

[47] U.S. CONST. amend. VIII.

incident in which no one was raped and no one was seriously injured, and which lasted two minutes or less."

Article I, section 14 of the Washington Constitution provides greater protection than the Eighth Amendment to the United States Constitution.[48] Therefore, if Kinzle's sentence does not violate the Washington provision, it also does not violate the federal provision.[49] "A sentence violates article I, section 14 when it is grossly disproportionate to the crime for which it is imposed."[50] It is grossly disproportionate "if it is clearly arbitrary and shocking to the sense of justice."[51] We consider the four Fain[52] factors to determine whether a sentence is grossly disproportionate: (1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions for the same offense, and (4) the punishment imposed for other offenses in the same jurisdiction.[53] No single factor is dispositive.[54]

---

[48] State v. Witherspoon, 171 Wn. App. 271, 301, 286 P.3d 996 (2012) (citing State v. Flores, 114 Wn. App. 218, 223, 56 P.3d 622 (2002)), petition for review filed, No. 88118-9 (Wash. Nov. 27, 2012).

[49] Witherspoon, 171 Wn. App. at 301 (citing Flores, 114 Wn. App. at 223).

[50] Witherspoon, 171 Wn. App. at 301 (citing Flores, 114 Wn. App. at 223).

[51] Witherspoon, 171 Wn. App. at 301 (citing State v. Smith, 93 Wn.2d 329, 344-45, 610 P.2d 869 (1980)).

[52] State v. Fain, 94 Wn.2d 387, 397, 617 P.2d 720 (1980).

[53] Witherspoon, 171 Wn. App. at 301 (citing Fain, 94 Wn.2d at 397).

[54] Witherspoon, 171 Wn. App. at 301 (citing State v. Gimarelli, 105 Wn. App. 370, 380-81, 20 P.3d 430 (2001)).

Under the first Fain factor, we consider the facts of the case and "whether the crime is a violent crime and whether it is a crime against a person or property."[55] In Fain, the defendant's life sentence for his third conviction for using fraud to obtain less than $470 was unconstitutional.[56] Fain committed a nonviolent property crime.[57] In contrast, in State v. Gimarelli,[58] the defendant's sentence was constitutional where he repeatedly touched a child's abdominal region, even after she pushed his hand away. There, Gimarelli was convicted of a violent sex offense against a child.[59] RCW 9.94A.030(54)(a)(v) defines "indecent liberties by forcible compulsion" as a "violent offense." It must be committed against a person. Kinzle had physical contact with the complaining witness, grabbing her, rubbing against her, pulling on her clothes, and squeezing her breast and buttocks. Because of the similarity between the facts in this case and those in Gimarelli, this factor supports the sentence's constitutionality.

Under the second Fain factor, the legislative purpose of RCW 9.94A.507 also supports the sentence's constitutionality. The Washington Supreme Court

---

[55] Gimarelli, 105 Wn. App. at 381 (citing State v. Morin, 100 Wn. App. 25, 30, 31, 995 P.2d 113 (2000)).

[56] Fain, 94 Wn.2d at 402.

[57] Fain, 94 Wn.2d at 398.

[58] 105 Wn. App. 370, 381, 20 P.3d 430 (2001).

[59] Gimarelli, 105 Wn. App. at 381.

discussed this matter in State v. Clarke.[60] The legislative history establishes that RCW 9.94A.507 intends an indeterminate sentencing scheme.[61] When the legislature adopted the Sentencing Reform Act of 1981,[62] it replaced Washington's indeterminate sentencing system with determinate sentencing.[63] In 2001, the legislature enacted RCW 9.94A.712 as part of an act concerned with managing sex offenders in the community.[64] The legislature redesigned the determinate sentencing system for some sex offenders because of concerns that determinate sentencing "does not allow the state to return a person under supervision in the community to prison beyond the end of his or her defined term."[65]

The law's structure also supports indeterminate sentencing.[66] Unlike determinate sentencing, RCW 9.94A.507(3)(a) requires the sentencing court to impose both a maximum and a minimum term. Additionally, RCW 9.94A.507 repeatedly references chapter 9.95 RCW, which governs indeterminate sentencing.

---

[60] 156 Wn.2d 880, 888-89, 134 P.3d 188 (2006). The court addressed RCW 9.94A.712, which the legislature recodified in 2008 as RCW 9.94A.507. See LAWS OF 2008, ch. 231, § 56.

[61] Clarke, 156 Wn.2d at 888.

[62] Ch. 9.94A RCW.

[63] Clarke, 156 Wn.2d at 888.

[64] LAWS OF 2001, 2d Spec. Sess., ch. 12, § 303; Clarke, 156 Wn.2d at 888.

[65] 2001 FINAL LEGISLATIVE REPORT, 57th Wash. Leg. at 233; Clarke, 156 Wn.2d at 888.

[66] See Clarke, 156 Wn.2d at 889.

Furthermore, just before the end of the offender's minimum term, the Indeterminate Sentence Review Board (ISRB) holds a hearing "to determine whether it is more likely than not that the offender will engage in sex offenses if released on conditions to be set by the board."[67] The ISRB must release the offender unless it determines by a preponderance of the evidence that the offender will commit sex offenses if released.[68] If the ISRB decides not to release the offender, it imposes a new minimum term.[69] This design is "'akin to Washington's former indeterminate sentencing scheme, where the trial court imposed the maximum sentence and the parole board set a minimum sentence.'"[70] If the ISRB releases the offender, he or she remains in community custody until his maximum sentence expires, subject to conditions that the court, the department of corrections, or the ISRB imposes.[71] We follow the Supreme Court's conclusion in <u>Clarke</u> that "[t]he manner in which this sentencing regime operates indicates that sentences imposed under [RCW 9.94A.507] are indeterminate."[72]

---

[67] RCW 9.95.420(3)(a).
[68] RCW 9.95.420(3)(a).
[69] RCW 9.95.420(3)(a).
[70] <u>Clarke</u>, 156 Wn.2d at 889 (quoting <u>State v. Clarke</u>, 124 Wn. App. 893, 899, 103 P.3d 262 (2004)).
[71] RCW 9.94A.507(5), (6).
[72] <u>Clarke</u>, 156 Wn.2d at 890.

The third consideration is the punishment that Kinzle would receive in other jurisdictions. "Washington's two strikes law as applied to the crime of indecent liberties by forcible compulsion may be one of the most stringent" sentences for sex offenders.[73] But a number of other states impose life sentences on those twice convicted of sex offenses.[74] This factor also weighs in favor of the sentence's constitutionality.

Fourth, we consider the punishment imposed for other offenses in this jurisdiction. Kinzle compares his sentence to that imposed for other offenses with the same seriousness level, as defined in RCW 9.94A.515, Table 2. We consider it more accurate, however, to compare his sentence to that imposed for other offenses included in RCW 9.94A.507.[75] The other sex offenses included in this two strikes law are first and second degree rape and first degree child molestation.[76] The law also includes certain nonsexual offenses when those offenses involve a sexual motivation: first and second degree murder, homicide

---

[73] Morin, 100 Wn. App. at 32.

[74] See GA. CODE ANN. § 17-10-7(b)(2) (West 2010) (second offense of rape or aggravated child molestation results in life sentence without parole); S.C. CODE ANN. § 17-25-45 (2010) (second offense of criminal sexual conduct with minor results in life sentence without parole); N.M. STAT. ANN. § 31-18-25 (1997) (mandating life in prison for a second conviction of criminal sexual penetration and not allowing parole if the victim of each offense is under 13); MONT. CODE ANN. § 46-18-219(1)(a) (2001) (mandating the death penalty or life imprisonment without the possibility of parole for second offense of sexual abuse of children).

[75] See Morin, 100 Wn. App. at 33.

[76] RCW 9.94A.507(1)(a)(i).

by abuse, first and second degree kidnapping, first and second degree assault, and first degree burglary.[77] All of these offenses are class A felonies and are most serious offenses under former RCW 9.94A.030(29) (2009), serious violent offenses under former RCW 9.94A.030(41) (2009), or violent offenses under former RCW 9.94A.030(50) (2009). Based on these classifications, we cannot meaningfully distinguish the crime of indecent liberties by forcible compulsion from the other crimes to which the two strikes law applies.[78]

Considering the four Fain factors, we hold that Kinzle's sentence is constitutional. The nature of his crime, the legislative purpose and the classification system for crimes included in the two strikes law, and the facts of this case all support his punishment. Kinzle's first strike was first degree child rape, which is a class A felony and a serious violent offense.[79] To commit the crime here, his second strike, he grabbed a store clerk, squeezed her breasts and buttocks, rubbed himself against her, and pulled on her clothes, despite her resistance. His punishment was not grossly disproportionate to the offense in this case.

---

[77] RCW 9.94A.507(1)(a)(ii).
[78] Morin, 100 Wn. App. at 33.
[79] RCW 9A.44.073(b); former RCW 9.94A.030(41)(vii) (2009).

-25-

Community Custody Conditions

Kinzle challenges—and the State concedes—that the trial court lacked authority to impose 7 of the 21 community custody conditions that it imposed on Kinzle. Those conditions are:

8.  Do not possess or control sexual stimulus material for your particular deviancy as defined by the supervising Community Corrections Officer and therapist except as provided for therapeutic purposes.

10.  Do not date women or form relationships with families who have minor children, as directed by the supervising Community Corrections Officer.

15.  Do not possess or consume controlled substances unless you have a legally issued prescription.

16.  Do not associate with known users or sellers of illegal drugs.

17.  Do not possess drug paraphernalia.

23.  You must subject to searches or inspections of any computer equipment to which you have regular access.

24.  You may not posses or maintain access to a computer, unless specifically authorized by your supervising Community Corrections Officer. You may not possess any computer parts or peripherals, including but not limited to hard drives, storage devices, digital cameras, web cams, wireless video devices or receivers, CD/DVD burners, or any device to store or reproduce digital media or images.

When a court sentences someone to a term of community custody, the Sentencing Reform Act, RCW 9.94A.703(1), requires it to impose certain conditions. RCW 9.94A.505(8) also permits a sentencing court to impose and

enforce crime-related prohibitions and affirmative conditions as a part of any sentence. Conditions of community custody may include "crime-related treatment or counseling services," participation in "rehabilitative programs," and compliance with "any crime-related prohibitions."[80] A "crime-related prohibition" is "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted."[81]

We review community custody conditions for an abuse of discretion.[82] We will reverse a sentence "only if it is 'manifestly unreasonable' such that 'no reasonable man would take the view adopted by the trial court.'"[83] We accept the State's concession. In State v. Bahl,[84] the Washington Supreme Court held that language similar to condition 8 was unconstitutionally vague: "The condition cannot identify materials that might be sexually stimulating for a deviancy when no deviancy has been diagnosed, and this record does not show that any deviancy has yet been identified. Accordingly, the condition is utterly lacking in any notice of what behavior would violate it." Similar to Bahl, the record here contains no evidence of any deviancy. Thus, the trial court improperly imposed condition 8.

---

[80] RCW 9.94A.703(3)(c), (d), (f).

[81] RCW 9.94A.030(10).

[82] State v. Riley, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993).

[83] Riley, 121 Wn.2d at 37 (quoting State v. Blight, 89 Wn.2d 38, 41, 569 P.2d 1129 (1977)).

[84] 164 Wn.2d 739, 761, 193 P.3d 678 (2008).

The court also abused its discretion when it imposed condition 10 because Kinzle's offense did not involve minor children and the circumstances of the crime were not related to minor children. The court improperly imposed conditions 15, 16, and 17 because the record contains no evidence that controlled substances were related to the circumstances of Kinzle's offense. The court also abused its discretion when it imposed conditions 23 and 24 because Kinzle's offense did not involve computers, nor was there a direct relationship between the circumstances of the crime and Kinzle's use of computers. Because the trial court lacked authority under the Sentencing Reform Act to impose these seven conditions of community custody, we accept the State's concession and hold that the court abused its discretion by imposing them on Kinzle. As such, we reverse and remand for resentencing that portion of Kinzle's sentence addressing the improper conditions.

Fabricated Evidence

At trial, the State introduced evidence that Kinzle tore the complaining witness's bra when he attacked her. The incident occurred on March 13, 2011. The complaining witness did not bring this evidence to law enforcement's attention until an interview on March 21. She did not mention it in an earlier written statement that she gave to police. In a statement of additional grounds, Kinzle alleges that the court should have questioned evidence of the complaining

witness's damaged bra. He alleges that the court had a duty to "at least investigate the validity" of this evidence because "it could be a reasonable conclusion" that the complaining witness or the State fabricated the evidence.

At trial, Kinzle did not object to this evidence. Because the failure to timely object to the admission of evidence at trial generally precludes appellate review, we decline to review his claim.[85]

Juror Bias

Kinzle also claims that an FBI (Federal Bureau of Investigation) investigator's presence on the jury violated his right to a fair trial. He argues that a member of the FBI would have easy access to his criminal record and would believe that law enforcement officials rarely suspect the wrong person. Further, he contends that as an FBI investigator, the juror "would have his views and opinion held in a high standard" and would have the ability to "sway[] the whole jury vote regardless of what the actual evidence shows."

Under Washington law, the right to a jury trial includes the right to an unprejudiced and unbiased jury.[86] The mere fact that the juror worked for the FBI did not compromise Kinzle's right to a fair jury trial. Kinzle does not identify any

---

[85] State v. O'Neil, 91 Wn. App. 978, 993, 967 P.2d 985 (1998).
[86] State v. Jackson, 75 Wn. App. 537, 543, 879 P.2d 307 (1994); see also U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 3, § 22 (amend. 10).

facts in the record that indicate prejudice or actual bias. Therefore, his claim fails.

Witness Perjury

Kinzle alleges that the court and the prosecutor violated his right to a fair trial by "knowingly letting the jury" consider perjured testimony. He states that the complaining witness's testimony at trial conflicted with Mr. Wood's testimony concerning Wood's location when Kinzle grabbed the complaining witness's buttocks, where that incident and the incident at issue took place, whether the complaining witness left the store, and what Kinzle wore at the time of the incident at issue.

Under RCW 9A.72.020(1), a person is guilty of first degree perjury if, while under oath and in an official proceeding, he or she makes a materially false statement that he or she knows to be false. A statement is material if it "could have affected the course or outcome of the proceeding."[87] Contradictory oral statements are insufficient to prove the falsity of a witness's testimony; independent evidence is required.[88]

---

[87] RCW 9A.72.010(1); In re Recall of Pearsall-Stipek, 141 Wn.2d 756, 772, 10 P.3d 1034 (2000). In State v. Abrams, 163 Wn.2d 277, 285, 178 P.3d 1021 (2008), the Washington Supreme Court held unconstitutional the provision in RCW 9A.72.010(1) requiring the court to determine as a matter of law the materiality of a false statement. It also held that the provision was severable. Abrams, 163 Wn.2d at 290.

[88] State v. Wallis, 50 Wn.2d 350, 354-55, 311 P.2d 659 (1957).

Both the complaining witness and Wood testified that Wood was standing near Kinzle when Kinzle first grabbed the complaining witness's buttocks. Both also testified that the complaining witness left the store after Kinzle attacked her. Because they testified to the same facts on these two points, there is no basis to conclude that either committed perjury.

The differences in the testimonies about the exact locations in the store where Kinzle grabbed the complaining witness's buttocks and where this incident took place were not material; any discrepancies in the witnesses' statements could not have affected the course or outcome of the proceeding. Wood and the complaining witness both testified that the events took place inside the store, that Wood was near Kinzle when Kinzle first grabbed her buttocks, and that Wood and Kinzle were in separate but close areas of the store at the time of the attack.

The complaining witness first told police that Kinzle wore a gray fleece jacket, stated at trial that he wore a brown jacket, and stated later in the trial that it was brown and grayish. She did not commit perjury when she conceded this inconsistency on cross-examination. First, nothing in the record shows that these statements were material. Second, her statement to police that Kinzle wore a gray fleece jacket constituted a prior inconsistent statement, which Kinzle could use only to impeach her credibility.[89]

---

[89] State v. Garland, 169 Wn. App. 869, 885, 282 P.3d 1137 (2012) (quoting State v. Burke, 163 Wn.2d 204, 219, 181 P.3d 1 (2008)).

Simply identifying differences in recollections about the location of the two incidents and Kinzle's clothing does not establish that one witness testified falsely. Conflicts in eyewitness testimony are well known to those who study the field. We defer to the trier of fact's credibility determinations on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.[90] Because the jury had a full opportunity to consider each witness's testimony, we do not disturb its credibility determinations.

Evidence of Wood's Prior Bad Act

Before trial, the court granted the State's motions in limine seeking to exclude evidence of Wood's prior bad act. The court prohibited Kinzle from introducing evidence of Wood's alleged sexual misbehavior in a different store on the same day as the incident at issue.[91] Kinzle's attorney agreed to this relief, and the court granted it. For the first time on appeal, Kinzle challenges the court's decision to exclude this evidence. He has not preserved this issue for appellate review. Even if he had, it lacks merit.

We review for abuse of discretion a trial court's evidentiary determinations.[92] "A trial court abuses its discretion when its decision is

---

[90] Raleigh, 157 Wn. App. at 736-37 (citing Thomas, 150 Wn.2d at 874-75).
[91] See ER 608(b) (prohibiting the use of extrinsic evidence of specific instances of a witness's conduct to attack or to support a witness's credibility).
[92] Embry, 171 Wn. App. at 737 (citing Stenson I, 132 Wn.2d at 701).

manifestly unreasonable or exercised on untenable grounds or for untenable reasons."[93]

The trial court did not abuse its discretion when it granted the State's motion. Because Kinzle did not make an offer of proof at trial, as ER 103(a)(2) requires, he waived any claim of error.[94] Kinzle also fails to demonstrate that this evidence was relevant to the incident at issue.[95]

Miranda Violation

Finally, in his statement of additional grounds, Kinzle claims that following the incident, police officers should have advised him of his Miranda rights before questioning him at his home. Accordingly, he contends that the court should not have permitted the officers to testify about "the things they observed" while questioning him, such as his demeanor, attitude, fear, anger, physical appearance, and nervousness.

Police officers must advise an individual of his or her Miranda rights "when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way."[96]

---

[93] Embry, 171 Wn. App. at 737 (citing State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)).

[94] Seattle First Nat'l Bank v. W. Coast Rubber, Inc., 41 Wn. App. 604, 609, 705 P.2d 800 (1985).

[95] See ER 402 (irrelevant evidence is inadmissible).

[96] Miranda, 384 U.S. at 477; State v. Lewis, 32 Wn. App. 13, 17, 645 P.2d 722 (1982).

Once officers have probable cause to believe that an individual has committed a crime, interrogation becomes custodial, and the officers must advise the individual of his Miranda rights.[97] Police officers have probable cause to make a warrantless arrest "when there is a reasonable ground for suspicion, supported by circumstances within the knowledge of the arresting officer to warrant a cautious person in believing that the accused was guilty of a crime."[98] "Mere suspicion, before the facts are reasonably developed, is not enough to turn the questioning into a custodial interrogation."[99]

Here, the police did not subject Kinzle to a custodial interrogation when they questioned him at his apartment. The record contains no information about the exact conversations that took place between Kinzle and the officers. Wood told the officers that Kinzle committed the attack, informed them that they could find Kinzle at the apartment where he and Kinzle lived, and then accompanied them to that location. Based on the information that Wood provided, the officers had grounds to suspect that Kinzle could provide information about the incident and justifiably saw the need to inquire further. Nothing in the record indicates that the officers had probable cause to make an arrest but delayed doing so to

---

[97] State v. Creach, 77 Wn.2d 194, 198, 461 P.2d 329 (1969), overruled in part on other grounds by State v. Russell, 125 Wn.2d 24, 882 P.2d 747 (1994).

[98] State v. Hilliard, 89 Wn.2d 430, 435, 573 P.2d 22 (1977) (citing State v. Parker, 79 Wn.2d 326, 328, 485 P.2d 60 (1971)).

[99] Hilliard, 89 Wn.2d at 436.

avoid a <u>Miranda</u> warning.[100] Therefore, we conclude that the court did not err in admitting the officers' testimony.

## CONCLUSION

Kinzle fails to show an irreconcilable conflict, a complete breakdown in communication, or a conflict of interest with his attorney. No evidence before the court would have provided a reason to doubt Kinzle's competence to stand trial. The complaining witness's testimony provided sufficient evidence for a rational juror to find forcible compulsion beyond a reasonable doubt. Kinzle fails to establish that the prosecutor's statements during closing were prejudicial or that his sentence is grossly disproportionate to his crime. The State concedes that seven of the community custody provisions are improper. No evidence in the record supports the claims that Kinzle asserts in his statement of additional grounds. For these reasons, we affirm Kinzle's conviction and remand for

---

[100] <u>See</u> <u>Hilliard</u>, 89 Wn.2d at 435.

striking that portion of Kinzle's judgment and sentence containing the improper community custody provisions.

Leach, C.J.

WE CONCUR:

Cox, J.